Madam Chief Judge, Your Honors, may it please the court. My name is Ashby Davis and I represent the appellant in this matter, Sgt. Damien Wells. The District Court erred in denying Sgt. Wells' motion for summary judgment for three primary reasons. First, the District Court erred by finding that Sgt. Wells had been deliberately indifferent to a serious medical need of Joshua Addington. There is no evidence that Sgt. Wells was aware of information that could lead to the inference that Mr. Addington was experiencing a life-threatening medical emergency, much less that he drew the inference and was subjectively aware of how serious the situation was. The second reason the District Court erred is that the District Court erred in finding that it was clearly established that Sgt. Wells' actions violated Mr. Addington's Eighth Amendment rights. The cases that the District Court cited and that the appellees echo on appeal simply have nothing to do with the particular conduct that Sgt. Wells was engaged in and was faced with, the particular circumstances of this case. And the Supreme Court has recently, as recently as October 2021, reaffirmed that that is an important element of the clearly established test. There has to be case law speaking to the particular conduct of Sgt. Wells. The third reason is that the plaintiffs failed to meet their burden of proof on their negligence claims under Louisiana law. There's no evidence that Sgt. Wells was negligent, nor is there any evidence that Sgt. Wells caused Mr. Addington's death. To briefly just talk about the facts of this case, Mr. Addington was a type 2 diabetic. He came into the jail on March 17, 2018. He had an extensive history that we detailed in our brief of over 15 hospitalizations for diabetic issues, kidney problems, alcohol and drug abuse. He did not inform anyone at Bayou Dorcheat Correctional Center and certainly not Sgt. Wells about those problems. That is a very important fact. The only thing that he told people at intake at Bayou Dorcheat was that he was a type 2 diabetic and he was on insulin. That's all they knew. The nurse came to the facility that very day, even though it was her day off, and put an individually labeled bag of insulin and filled those syringes for him and explained how he could get his insulin. As the district court found, he had access to his insulin. It was in the nurse's station. All he had to do was ask to test his blood sugar and go get his insulin. He had access at all times and there's no evidence to the contrary. We do have to accept for purposes of this appeal, Judge Foote's finding that he didn't take insulin between discharge and death, correct? I don't believe so, Your Honor, because the district court ignored the nurse's testimony. That's the only evidence as to whether or not he had his insulin from March 30 to April 1, 2018. That's the time period that's particularly at issue. The district court did not note that Nurse Closh testified there was no excess of syringes when she returned the day after his death. The district court just simply ignored that fact. That doesn't mean he necessarily took it. That just means for whatever reason they couldn't find excess insulin syringes. I think that's the only evidence that directly speaks to whether or not he had his insulin at that time. Your argument is even if we accept that fact, no insulin taken still for the reasons you've described? Certainly, Your Honor. Even if you accept it, and I don't think the court should, but if you accept the fact that he didn't take any insulin, there's still no reason that Sergeant Wells should have realized he had a serious medical need and he did not certainly subjectively realize that he had a serious medical need. Furthermore, obviously, there's the clearly established element that also would apply. So to get back to just some of the underlying facts, on March 30, he goes to the hospital because he has a low blood sugar incident, and Sergeant Wells directly participates in that. He responds to it. He assists in responding to that issue. He's aware that Mr. Addington had a low blood sugar incident, and when he comes back, that's what they're concerned about. That's what the discharge instructions from the hospital warned about. Don't let him get below 54. While he's in the holding cell, first of all, Sergeant Wells actually transferred him to the holding cell. What in the record was he told about? Don't go below 54, but don't go above some number. In the record, the Minden Medical Center records say that he should not go above 400. That is the critical level identified in the Minden Medical Center records. Sergeant Wells testified in his deposition that his subjective perception was that I needed to notify medical if he got above 500, and the highest blood sugar reading that Mr. Addington had while he was in the holding cell that Sergeant Wells transferred him to was 366, and that was on the morning of April 1st. It was 364 about midday on March 31st, and it actually went down as the day went on on March 31st. The hospital records say 400 is the critical level. And in terms of case law, your position is that at some point, it would be clearly established that you would have to contact medical authorities. Well, I have not found any case law that says a particular level at which a blood sugar level needs to be at that would clearly establish that. There is certainly no case that speaks to the specific context at issue here that Sergeant Wells was dealing with. Prison staff were forever taking vital signs, and pulse, temperature, breathing, blood pressure. You're not saying that there has to be a case exactly on point at this amount? There has to be a case that's very close, Your Honor. It has to be at least in the ballpark, and there's nothing that's been cited to this court or cited by the district court that would even come close. It would be satisfying if the doctor's instructions said he could go into heart failure, have a stroke, whatever. If this blood pressure reading or whatever it was goes into this level, send him to the emergency room. Now, that seems to me we don't have to have a case that says like that if the doctor's instructions tell the prison staffer to do that. The prison staffer saw it, did the test, exceeded that benchmark and did nothing. Perhaps that could be the case. That's not this case, Your Honor. This case deals with discharge instructions telling Sergeant Wells about a low blood sugar potential problem, whereas there was nothing about the high blood sugar. So the event that had precipitated his visit to the... How come you said there was something? In the Menden Medical Center records, yes, Your Honor. That's a 400. Now, I don't think that was actually handed to Sergeant Wells. Okay, that's my question. What was given to Sergeant Wells by anybody that would let him know what a danger range was on a high blood pressure, high blood sugar level? I don't believe that there was anything specifically given to Sergeant Wells. However, his testimony is that if it was 500, that's the level at which I subjectively perceived I needed to inform medical. And that's on pages 2703 and 2709 of the record. When you started out with the elements of the deliberate indifference, it's know of the facts, draw the inference. Okay, and so there isn't any scienter requiring malice or an intent to hurt. There is not under Farmer v. Brennan and Cleveland v. Bell, all the other cases. Now, there is some confusion in some of the other cases, but there's not an element under Farmer v. Brennan, which is the controlling Supreme Court precedent. However, there's no evidence that Sergeant Wells subjectively perceived that Mr. Addington was in distress. He said that I thought it was 500. He was conscious the whole time he was dealing with him? He was conscious the whole time. He actually testified that I had my guys, my deputies, going in to check on him, take his blood sugar readings. And again, Sergeant Wells is the one who actually had Mr. Addington transfer to the holding cell, and he said, look, I use the holding cell so that on my shift, if there's somebody who has a problem, he's going to be closer to the entrance to the facility. And at that point, if we have to call EMS, we can get him faster care because it's closer to the entrance. It also is equipped with a buzzer, and that's very important. If Mr. Addington needed care, he could have pressed that buzzer at any time, and it goes to the master control area of the facility, where there's always a deputy stationed. And so there's no evidence that he asked for any help. Mr. Addington knew how to fill out a medical request form, and we know that because he had previously asked for a medical request form for a diabetic snack at night, and the nurse granted that. He filled it out, he turned it in, the nurse granted that. So he knew how to ask for medical care, and he never did. Were there forms asking for insulin shots? Well, there's a general medical request form that could have been used, but he never submitted anything like that during the time that he was in the holding cell. I guess my question is, would he have to sign a form to get insulin, or was that just something that the staff was told? My understanding was the staff was told if it's a certain level, he gets an insulin shot. Well, Mr. Addington at any time could have asked, hey, I need to test my blood sugar. Can I test my blood sugar? And the record evidence shows the deputy's testimony was uniform on that. If I want to get my insulin shot, he can go get his insulin shot. But they tested him. Well, I believe how it works is the deputy would give him the test, he could self-administer the test, and then take it back. In other words, the deputy would take the testing equipment back. The deputy would see the reading. That's correct, Your Honor. And then they would radio the reading so that others could write down the reading in the master control or key log. There are logs of what his readings were during this time. Yes, Your Honor. How many readings were there? I believe as the district court found, he was tested every day except one. There was a record of him being tested. So throughout his time at the facility... On the day of his death, three or four? It was the day before, it was four times. On the morning, it was one time. And again, I think I'm starting to run out of time, so I want to hit on two important points. First, the medical expert testimony in the record, there is only one doctor who has testified in the record, and that is Dr. Hurd. That's the doctor at the facility. He expressly stated that Mr. Addington never reached a level that warranted an immediate return transport to the ER. But there was a Dr. Hughes. But the district court excluded his opinions. The district court excluded his reports because the only thing that was turned in was just the reports. There was no affidavit. There was no declaration, anything like that. So the only expert testimony in the record is Dr. Hurd's testimony that Mr. Addington never reached a level that warranted an immediate return transport to the ER. I want to turn to the clearly established element. I think I've talked about both the objective and the subjective parts of the deliberate indifference test, but I want to talk about the clearly established test because that's very important. As I said in the first part of my remarks, the Supreme Court has recently, in the Cortez Luna and the City of Tahlequah cases, reinforced that you have to have a case that's very close and that you cannot simply define clearly established law at a high level of generality. And that's exactly what the district court did. Respectfully, the district court erred in doing so. Judge Higginson, you have asked several times for this morning during advocates' arguments, what's your best case? Cleveland v. Bell is the best case that I could find on both the deliberate indifference test as well as the clearly established test. So Cleveland v. Bell involved a 72-year-old inmate who had diabetes. He had high blood pressure. He had peripheral artery disease. He actually informed people. Unlike Mr. Addington, he actually informed people at the jail of those conditions. He encounters Nurse Bell. He says to Nurse Bell, I can't even get up. I'm too weak to come get my medicine. She subjectively believed that he was faking. That happened on another occasion as well where she was informed that he was saying, I'm too tired, I can't get up. She subjectively believed he's faking. Well, in that case, the court held, this court held, that doesn't meet the deliberate indifference test because there's nothing to show that her subjective statement, look, I thought he was faking, was anything other than the truth. And that's the same with Sergeant Wells in this case. In fact, Cleveland v. Bell, this is an even stronger case than that because that was a nurse. Sergeant Wells is not a medical professional. That was a nurse in that case. Number two, that case involved an express statement to the nurse that he felt like he was too tired, felt like he was too weak to even stand up and get his medicine. There's no evidence, as I discussed earlier, that Mr. Addington ever asked for help while he was in the holding cell, even though he knew how to ask for help and even though he had a buzzer in his cell that could be used to ask for help. And third... To the extent there is sort of a unifying theme to these deliberate indifference cases, it's a prison staff that defies a medical order or a prison staff that refuses an explicit request from the patient or obviousness, correct? Dyer, Thompson, those cases are... You can still have a claim if the staff ignores something obvious. That's correct. And that's sort of the world they have to be in here. That's basically correct, Your Honor. And the obvious... To speak to that obvious issue, and I think we addressed that at length in our brief, the obviousness test usually involves a direct request for help, a physical injury or observable erratic behavior like in the Fielder case, which this court has distinguished on numerous occasions when district courts like the district court in this case has said Fielder clearly establishes the law. This court has said, no, that's not correct because Fielder involved erratic behavior, express requests for medical treatment multiple times. So... It's sort of the world we're in versus is blood pressure, you know, 200 or not breathing. Here, the argument is over 300 sugars. Well, I think the obviousness test, at least certainly in the cases that the district court cited, is all about physical injury, erratic behavior, express requests for medical care that are refused, and there is no evidence of that in this case. There just simply isn't any. To briefly touch on the state law... I have a question. Did they... I should know the answer to this, and I don't. Did they do an autopsy on him? They did do an autopsy. And the cause of death was? The cause of death was acute kidney failure due to diabetic ketoacidosis, complicating cardiovascular disease. And so... I'm trying to quote it exactly, and I'm sorry, I realize I'm out of time. So I'll address this on my own. Good morning. May it please the court. My name is Amanda Olmstead, and I am here today on behalf of Mallory, Cody, and Landon Addington, appellees in this case. We are here today on a very narrow issue. Did the lower court err in denying summary judgment based on qualified immunity? Appellees contend that it did not. The issue regarding qualified immunity has two prongs, but before I discuss those prongs further, I want to discuss this court's jurisdiction over this matter, which appellees raised in their brief and appellants did not respond to in their reply brief or here today. Generally, appellate courts do not have jurisdiction to review denials of summary judgment as those are not final orders. Appellate courts do, under the collateral order doctrine, however, have the power to review denials of summary judgment, which are based on the denial of qualified immunity. However, the appellate court's jurisdiction over these matters are significantly limited. According to Gobert v. Caldwell, which was decided by the Fifth Circuit in 2006, if the district court concludes the summary judgment record raises a genuine issue of material fact with respect to whether qualified immunity is applicable, then that decision is not immediately appealable. Rather, the appellate courts may consider only whether the district court erred in assessing the legal significance of the conduct that the district court deemed sufficiently supported for purposes of summary judgment. Essentially, the appellate court does not have jurisdiction to weigh the facts or go back over the facts as appellant contended here today. So what's the specific fact you say that they're seeking to adjust, that he may have taken insulin? Or in other words, I thought Judge Foote concluded, correctly or wrongly, that he didn't take insulin between discharge and death. And therefore, you're saying that fact is fixed? Yes, Your Honor, I would say that... But you didn't find that he had refused, that Wells refused a request for it, correct? Or that Wells refused to follow a medical order, right? Correct, Your Honors. Judge Foote, the district court, based its decision on four facts, essentially, and said that those facts were fixed and that the appellate court then can't go back and weigh the sufficiency of the evidence to determine whether or not those facts are sufficiently supported. And those facts are that Sergeant Wells knew Addington was an insulin-dependent diabetic, knew Addington had alarmingly high glucose levels, knew or should have been aware because it was so obvious of an unjustifiable risk to Addington's health, and did nothing to seek medical attention. How did he know that the levels were alarming? Your Honor, so as appellants contended, they said in Sergeant Wells' deposition that he said anything over 500 would be alarming. That is a misstatement of the deposition. He said that anything over 100 would be high. And then he provided an exaggeration of, oh, well, if it's over 500, then maybe. He didn't set 500 as the set limit that he would then notify medical staff. In fact, in his unusual... Who's the he here? Sergeant Wells, I'm sorry. Because I thought Addington himself at Oshner had said, oh, yeah, I'm always up around 400. Sergeant Wells was not privy to that, the medical record. The medical record was not requested by BDCC, so no officials, no medical personnel at BDCC had Addington's prior record. Okay. And, in fact, in the... You have to have some medical evidence that 100 is, in fact, if you don't do something about that, he needs to be transported immediately. Where's the medical evidence of that? We have the deposition testimony of Dr. Hughes, which is Plaintiff's expert in this case, indicating that the failure to provide insulin to Addington from the time that he was discharged from the ER until the time that he passed contributed or caused to Addington's death. What specific facts support that conclusion? I'm sorry, can you repeat that? What specific facts support that conclusion? I would say that in the unusual occurrence report, that Sergeant Wells filled out, listing the blood sugar levels that Addington had exhibited the day before he passed away, it says, I'm filling out this unusual occurrence report for the purposes of medical to review these blood sugar levels. So he did, in fact, know that these blood sugar levels were high and should be reviewed by medical. You knew the levels, right? I guess, since you're relying on Dr. Hughes, did Dr. Hughes contradict Dr. Hurd, saying these numbers are not abnormal for Addington? Did Hughes speak to that? I'm not sure. I don't have the deposition in front of me, but Dr. Hughes did contradict Dr. Hurd's testimony and report saying that diabetic ketoacidosis, which is what Addington died of, is an acute emergent medical event that can be treated, and that if he was given his insulin, and that's another point. Addington was an insulin-dependent diabetic. It said on the one medical chart that they had for Addington that he was supposed to get insulin twice a day. There is no evidence that he got his insulin twice a day. He needed his insulin to regulate his blood sugar levels. But there's no evidence that anyone impeded him from getting it. There's no evidence that he refused his insulin either. There's a master control log and an administrative record where they log whether or not he got his insulin, and there's no evidence that he was taken to get his insulin. He was in a medical observation holding cell. He could not go by himself to get the insulin. He would have had to have been transported by a deputy or Sergeant Wells when Sergeant Wells saw that he had high blood sugar levels, which Sergeant Wells knew that they were high because he filled out that unusual occurrence report  There's no testimony that anybody took Addington to get his insulin. Why did I think? Maybe I just don't have the facts straight. I had the idea that he administered his own insulin regularly, which means he must have had it somewhere. They're in a medical room, essentially, and they're in a refrigerator, but they would have to have an officer take them to go to that holding cell because it's a sharp, it's a needle, and so they can't have inmates have those needles or sharps with them in their cells, so they have to be transported to the medical cell, get their insulin, and then transported back. And the day he died, am I correct? It may not be at all, that he had gotten an insulin shot in that morning. Was I wrong about that? There's no evidence that he got his insulin. On the record that the prison has, when was his last shot? I believe it's the day before he went to the emergency room. There's no evidence in the record that from the day that he was discharged from the emergency room to the day that he passed away that he received his insulin. Oh, well. So that proved to be fatal, huh? Yes, Your Honor. And again, diabetic ketoacidosis is in fact an emergent event that can be treated. Addington had suffered diabetic ketoacidosis before when he was in previous prisons. However, he was able to be treated because he was given his insulin, which he was an insulin-dependent diabetic, so he needed his insulin. You're saying there's no evidence that he received an insulin shot after being discharged from the hospital until his death? That's right. That's the finding. But at the same time, there's no finding that anyone impeded him, and he's cogent and conscious the whole time. I guess I'm beginning to inch towards clearly established law, which is where I'm sure you want to go. Yes. Because that is a very high standard, and it tends to be prison staff have to refuse the request, have to refuse the order. There had to be something in the record saying you have to take him to get it, and then they defy it. Or those cases like Dyer, which you rely on, where it's so obvious they need to intervene. But this is pretty far from Dyer, right? Wouldn't you say? Your Honor, I would argue that this is close to Dyer in that he, Addington, if we go to the district court's facts that they based their opinion on in denying qualified immunity, Sergeant Wells knew Addington was an insulin-dependent diabetic and knew Addington had alarmingly high glucose levels. In Dyer, the court found that Graham violently hit his head against the interior of the patrol car, and they were fully aware of the seriousness of the danger. I don't believe in Dyer there's any indication that Graham... But the officers that see Dyer slamming his head repeatedly were the same ones that send, when they get to the prison, they say he has been medically cleared at the scene. Yes. I'm sorry. No, go ahead. I would argue that, again, the district court's findings of fact are fixed, and we're not here today to weigh the sufficiency of the evidence and whether... I have another question about that. What's the evidence as to whether there would have been a written report every time he got an insulin shot? It is said throughout the testimony of the depositions that there is a master... And it shows in the master control log and the medication administration record, it's supposed to list, okay, got his insulin at this time, got his insulin at this time. We were giving his insulin twice a day. And it's a little bit confusing, and it's hard, and that's an issue in and of itself, but that's not before the court today,  and figure out when he got his insulin. The experts in this case were able to do that and determined that he did not get his insulin on those days. Yeah. Wasn't he supposed to get it twice a day? Yes, Your Honor. I assume that they don't do it back-to-back. I assume you get one in the morning and one at night or whatever. Yes, Your Honor. And he didn't get one in the morning. The record shows that. That is correct, Your Honor.  and did not get it at night, and also did not get it when Sergeant Wells reported his insulin levels. We know that Sergeant Wells knew that those were unusually high as he filled out an unusual occurrence report indicating those blood sugars. He would not have filled that out if he thought or knew that those blood sugars were normal for Addington. So we would argue that there is clearly established law. You can sum up all of those cases to say that when an inmate, and as Your Honor said, that when an inmate is exhibiting obvious medical needs and the official is aware of those obvious medical needs and the official does nothing to provide medical treatment, whether that's notifying medical, whether or not that's, you know, if they're a nurse administering the medication themselves. But Sergeant Wells, instead, viewing these unusually high... The highest was 360-something? Yes, Your Honor. So what was it that put Wells on notice that this was something that needed immediate attention? In his own deposition, he said that anything over 100 would be high. What's the medical evidence? I thought the only medical evidence was 400. Again, Your Honor, Sergeant Wells didn't have that, so he was not given anything to know that 400 was the cutoff. He was looking for low blood sugars, so he wasn't looking for the high blood sugars. Maybe negligence, but intentional and wanton disregard? I would argue that by him... The way I'm listening to oral argument, my thoughts are slightly shifting. The issue isn't so much the obviousness of these numbers, him having awareness that at that point you've got to get him to the hospital. It's more this secondary log that would have told the staff that they were required to take him to get two insulins, and no one ever did. So they... Am I correct? Did Judge Foote go in this direction? The deliberate indifference was the failure to take him to get his insulin. I thought it was the failure to extrapolate from the numbers that this means you've got to call medical people. She did... Noted that he was not given his insulin, and she did include that in her opinion, as far as my understanding. And I would argue as well that filling out the unusual occurrence report and putting it... And not notifying medical, despite saying, I'm filling out this unusual occurrence report to notify medical, and then essentially throwing it away, knowing that Nurse Clonch wouldn't be at the facility for another three days, and putting it in her box, it is essentially turning a blind eye to this man's emergent medical needs. While we're still unclear, there was stress made on Cleveland, the Cleveland decision. Yes, Your Honor. And I would distinguish... I would distinguish Cleveland in that in Cleveland, the inmate was provided medical treatment. When he requested to go to the emergency room, he was brought to the emergency room, and then it was a judgment call that the nurse did not bring him to the emergency room on the second time that he got his complaint. It is also indicated that he refused his medication. There's no evidence here that Addington refused his insulin. In fact, he was supposed to get it twice a day, and again, there's no evidence that he was given his insulin. Thank you. I've still come back to, what evidence is there that Wells knew of a number that in fact was medically off the charts? He said it was 100, but you don't have any experts saying 100. Yes, that's right. Something needed to happen if his number was 100. I would just go back to the unusual occurrence report, which he filled out, that said that these numbers are high enough to be unusual. Right. Where's the medical evidence that he should have known something? He knew they were unusual, but where's the medical evidence he knew this was something that you needed to take him to the emergency room? He needed insulin shots. Where is it? What put Wells on notice that he knew they were high? He wrote in the unusual occurrence report, this is to notify medical. He knew that he was supposed to notify medical of those blood sugar readings, but there's no evidence that he did do the follow-up to notify medical. What happened to those forms? They were put in Nurse Clonch's box, but she wasn't going to get to those for three days. And we know that... Where's the evidence that Wells knew three days was too long? I'm just saying, he was not a doctor. What put him on notice that if I wait until Wells gets back, that's going to be too late? I would argue that, again, he put that... I would argue that he put it in the unusual occurrence report that he was supposed to notify medical, and regardless of that fact, Addington was supposed to get his insulin twice a day. Wells wrote those blood sugar levels down at the time, around the time that Addington was supposed to get his insulin for that day. So that, in combination with the unusually high insulin levels and the fact that he was supposed to get his insulin at that time, and Sergeant Wells knew that he was an insulin-dependent diabetic, knew he was supposed to get his insulin twice a day, knew that he had an unusually high blood sugar level. Did he say he thought 100 was high? I thought he said 400 or something. So in... Wells himself said what he would be worried about was over 400. Sergeant Wells, in his deposition, said that over... When asked what would be a high blood sugar level, he said 100. But then, he did say 100, yes. But then he goes on to exaggerate, and that's where you get the 500. But he didn't say, this is the limit of when I would. It could be 300. It could be 400. He said over 100 would be high. But we know that Addington was hardly ever at 100. He was way over 100 most of the time. Sergeant Wells did not know that at that time. But... Never mind. Go ahead. Again, I would argue, and I would... I'm running out of time, so I would just argue that the district court already made a determination on the facts here. The appellate court does not have jurisdiction to re-weigh all of those facts as been decided by and elaborated in the majority of the case law that deals with qualified immunity cases. These specific facts that support the district court's decision, even that's to be decided at trial. We are not here today to re-litigate or re-hash summary judgment. The appellate court's job is not to grant summary judgments. So I would argue that we are fixed with the facts that the district court laid out in denying qualified immunity and see whether or not those that she believed reviewing the record that plaintiffs could be able to prove at trial. And... You're just, before your time's up, your best clearly established law case that would have notified Sergeant Wells that he was violating a constitutional right here is what? I would say that our best case is... is Dyer, in that Dyer didn't specifically request it. There was an obvious medical need and medical was not notified. And we would ask that you uphold the lower court's decision. Thank you very much for your time. Your Honor, you just asked what the best case was on clearly established law and plaintiff's counsel just said that Dyer was the best case they had. That is light years away from this case. Dyer involved a gentleman who was clearly exhibiting erratic behavior and was on LSD and banged his head 46 times against a metal cage in a police car that was observed by police officers. There is no factual relevance between that case and this case. Sergeant Wells had literally just assisted in obtaining medical care for Mr. Addington from a doctor at a hospital and he placed him in a holding cell so that he could be closer to medical care if he needed it. He had his deputies testing Mr. Addington's blood sugar. What about the second logs that I hadn't focused on as much? You understood that argument which is that the deliberate indifference and the violation was more than required to take him to get insulin. Well, I think the important point there, Your Honor, is that Mr. Addington had access to his insulin at all times. And in fact, under the testimony in the record, when he was moved to the holding cell, it's literally right across the hall from the nurse's station where the refrigerator is with his individually labeled bag of insulin. And there is no evidence that Mr. Addington was ever deprived of access to that. He just asked for it. And he could have used... Is that how diabetic inmates... They've got to ask even though it's clear they've got to get it two days. So what happens if they just don't ask? Yeah, which is what happened here apparently. Who's responsibility? Do they inject him? The diabetics inject themselves because they know how to do that. And the evidence is... Bring it to him. They have to... Their responsibility is only triggered... I mean, you would think they'd be looking at these people that are maybe very distressed. They forget to ask. They're elderly. They're compromised. You're saying there's no responsibility to say, okay, we've got to do this twice today. Well, the nurse testified in her deposition that she meets with diabetic inmates just like she came up on her day off to fill the syringes and says to them, look, you need to come get your insulin. They can't come get it. They've got to ask. There is a deputy at all times available when they're in the dorm to do that. And when he was in the holding cell, he had a buzzer available. It's also a very high traffic area. So he could have asked at any time. Is this the basis that Judge Foote ruled on? This not pushing the buzzer versus them getting it to him? Well, the basis that Judge Foote ruled on was a finding, for example, she said that the warden testified that in his opinion she sensed that Addington's levels were high and I see I'm out of time. Can I finish my response to your question? Judge Foote said the warden testified in his deposition that he thought those levels were too high. But at the same time, he said, well, I can't tell you what Sergeant Wills was thinking. That's fair. I'm not asking about the levels. I'm asking about the two deliveries of insulin and who's, what is the record or what did Judge Foote find about whose responsibility it was to administer the insulin? Actually, what Judge Foote found, because she dismissed the claims against the nurse, against the warden, against the sheriff, and actually found that the, there was no evidence of deliberate indifference in the manner in which insulin and diabetic care occurred at the jail. She actually found that in dismissing the other claims against the other parties. Thank you. Those are our arguments for today. The court will stand in recess until 9 o'clock in the morning.